[L. A. Nos. 12666 and 12771. In Bank.—October 23, 1933.]

PACIFIC PALISADES ASSOCIATION (a Corporation), Respondent, **v.** BERTHA DEGLOW MENNINGER, Appellant.

258

D. A. Knapp and Paul Washburn for Appellant.

Tanner, Odell & Taft for Respondent.

Stearns, Luce & Forward, as *Amici Curiae* on Behalf of Respondent.

THE COURT.—Plaintiff brought this action for the purpose of securing a judgment compelling defendant to pay the taxes on six lots located in a subdivision known as Pacific Palisades near Los Angeles, or, in the alternative, if defendant failed to pay the taxes, for a judgment foreclosing defendant's rights in the lots and quieting plaintiff's title thereto. The complaint is in six counts, each differing from the others only as to the lot described. Plaintiff alleges that in March, 1923, plaintiff agreed to sell to defendant, and defendant agreed to buy from plaintiff, renewable ninety-nine year leases on the lots in question. The sales agreement signed by the parties and dated March 26, 1923, is attached as an exhibit to the complaint. It provides that upon defendant completing all payments called for by the agreement plaintiff ''agrees to deliver . . . a renewable ninety-nine year lease, in substantially the form contained in the Founders' Hand Book of said Pacific Palisades Association. . . . '' The complaint further alleges that defendant has paid the full purchase price of the six leases (totaling over $7,000); that such payments together with interest were completed in April, 1926; that plaintiff thereupon tendered to defendant leases in the form agreed upon; that defendant refused to execute the leases; that defendant has not paid the taxes levied against the property for the period 1925 to 1929; that plaintiff has paid or will be compelled to pay the taxes. The prayer of the complaint requested that the amount of the taxes be ascertained; that defendant be ordered to pay the same within thirty days after judgment; that if defendant fail to pay the taxes within that period her interest in the lots be foreclosed and plaintiff's title thereto be quieted. The form of the lease alleged to have been tendered by plaintiff to defendant is attached to the complaint as an exhibit. That lease, in paragraph 2 of the covenants on the part of the tenant, expressly

provides that the tenant shall pay all state, county or city taxes on assessments levied on the lots.

■ The answer of defendant alleges that the leases tendered and pleaded are not the leases agreed upon; that under the agreement between the parties she was entitled to leases which did not impose the burden of paying the taxes on her. Defendant also set forth in great detail and at some length an affirmative defense and a cross-complaint. It is therein alleged that plaintiff holds title to the 1100 acres of land known as Pacific Palisades, of which the six lots are a part, in trust for defendant and others known as "Founders"; that the terms of this trust were that a local church, under the authority of a religious corporation, should cause the plaintiff to be incorporated; should collect from certain individuals, to be known as "Founders", a sufficient sum to buy the area under contract, and that plaintiff was to improve and operate the land as an educational, cultural, recreational and religious center; that plaintiff was to lease the lots therein to the "Founders" for residential purposes; that the consideration for this trust agreement has failed because of certain alleged violations of the trust by plaintiff. The cross-complaint, in addition, alleges that plaintiff has failed to carry out the proposed development and in violation of the trust has mortgaged the lands, purchased additional acreage and deeded away portions thereof; that plaintiff has dissipated the trust assets and violated its charter; that the religious corporation has ignored its agreement with the Founders to supervise plaintiff's execution of the trust; that the trust is now impossible of fulfillment. The prayer of defendant's answer is that plaintiff be not granted the relief prayed for by it; that a decree be entered to the effect that plaintiff holds title to all the property in trust for the Founders; that the trust be terminated and all of the lessees be given fee simple titles; that receivers be appointed to liquidate the trust; that a referee be appointed for the purpose of an accounting; that the receivers shall be ordered to request the attorney-general to proceed against plaintiff to forfeit its charter.

On motion of the plaintiff the cross-complaint was stricken out on the ground that the matters pleaded therein did not constitute a cross-complaint within the meaning of section 442 of the Code of Civil Procedure. Defendant assigns this

as error. We are of the opinion that the trial court correctly decided that the matters alleged in the pleading in question did not constitute a proper cross-complaint. Section 442 of the Code of Civil Procedure, so far as pertinent here, provides:

"Whenever the defendant seeks affirmative relief against any party, relating to or depending upon the contract, . . . upon which the action is brought, or affecting the property to which the action relates, he may . . . file . . . a cross-complaint."

The alleged trust set forth in the cross-complaint does not refer to or depend upon the contract of sale pleaded in the complaint (*Interstate Lumber Co.* v. *Loop Building Co.*, 97 Cal. App. 64 [275 Pac. 262]), nor do the matters therein pleaded affect the property to which the action relates within the meaning of section 442 of the Code of Civil Procedure. As was said in *Mahan* v. *Millar*, 56 Cal. App. 280, 288 [205 Pac. 67]:

"We cannot believe that the legislature, in enacting section 442, intended that the right to file a cross-complaint should extend so far. It cannot be that in a legal sense, speaking in the terms of the section, a cross-complaint *affects* the property to which an action relates when it seeks affirmative relief concerning a single and indivisible parcel of land which includes within its borders a lesser tract, which lesser tract is the subject of the action as shown by the allegations of the complaint."

The cross-complaint was therefore properly stricken out.

After a trial on the merits the trial court entered a judgment, which it called "interlocutory", which will hereafter be referred to as the first judgment, and which provided that unless defendant paid certain taxes on the lots within thirty days, then, without further proof, her interest in the lots should be foreclosed, and plaintiff's title thereto should be quieted. Upon the expiration of the specified period, defendant not having paid the taxes, the trial court entered a second and final judgment foreclosing defendant's rights and quieting plaintiff's title. Defendant appealed from both the first and second judgments. Defendant properly ordered and filed a complete transcript in the appeal from the first judgment, but on the appeal from the second judgment she had prepared and filed simply a supplemen-

tary transcript containing all proceedings subsequent to the rendering of the first judgment. Upon affidavit and stipulation this court consolidated the two appeals. Plaintiff has moved to dismiss the appeal from the first judgment on the ground that that judgment is interlocutory in nature, and therefore not appealable. Plaintiff has also moved to dismiss the appeal from the second and final judgment, if its first motion is granted, on the ground that if the first appeal is dismissed there will then not be a complete transcript on the second appeal. These motions to dismiss the appeals are denied. No useful purpose would be served in determining whether the first judgment was appealable or not. Assuming, but not deciding, that the first judgment was interlocutory, the motion to dismiss the second appeal is based on highly technical grounds and is without merit. The parties to the two appeals are the same. There is now before this court a complete clerk's and reporter's transcript, so that the case may be decided on its substantial merits. The exact point has been decided adversely to the contention of plaintiff in the case of *Bryant* v. *Kelly,* 203 Cal. 721, 722 [265 Pac. 817], where it was stated:

"The appellant filed two separate and distinct notices of appeal, the first stating that he appealed from the two nonappealable orders above referred to; the second, that he appealed from the judgment there rendered. It appears, however, that appellant filed but one request for a transcript, that filed in connection with the attempted appeal from the nonappealable orders. Respondents urge, therefore, that there is no transcript properly before the court in connection with the appeal from the judgment. The cases relied on, *Goyhinech* v. *Goyhinech,* 80 Cal. 410 [22 Pac. 175], and *Soule Co.* v. *Severtson,* 68 Cal. App. 46 [228 Pac. 351], correctly state the rule when applied to the facts there involved, but are not applicable to this appeal. There is here but the one appealing party, and there is before the court a transcript of the proceedings had in the lower court which fully enables this court to pass upon the merits of the appeal from the judgment."

We turn now to a determination of the merits of the appeal. The sole question presented is whether plaintiff has tendered leases in accordance with the provisions of the sales agreement, that are "in substantially the form con-

tained in the Founders Hand Book of said Pacific Palisades Association''. Defendant contends that the tendered leases provided that she should pay the taxes levied on the property, and that under the agreement of the parties she was entitled to leases which imposed this burden on the plaintiff as landlord. Plaintiff contends that the tendered leases containing the tax clause are in accordance with the agreement of the parties. The trial court found in favor of plaintiff on this issue. Defendant attacks these findings as being unsupported by the evidence.

The evidence shows that the project here involved was first promoted by the Huntington Beach Methodist Assembly, a corporation. This corporation purchased a large tract of land at Pacific Palisades and the lots involved in this case are a part thereof. In order to raise the money to make the first payment on this land the Huntington Beach Methodist Assembly solicited money from individuals to be known as Founders. In return for money advanced the Founder was given a Founders certificate. Defendant was the holder of such a certificate dated August 31, 1921, in the sum of $1,000. The son of defendant, Elmore William Menninger, and defendant's business agent, was also the holder of such a certificate of the same date and amount. The rights under this last-mentioned certificate were subsequently assigned to defendant. The Founders certificate recited that defendant, as a Founder, was entitled to a leasehold interest of the value of $1,000 in the property to be acquired by the Huntington Beach Methodist Assembly, which property was to be conveyed to a corporation organized for that purpose. This corporation referred to was subsequently organized and the land conveyed to it, it being the plaintiff in this action. The purpose of the project was stated to be to found on the land acquired a religious and educational center. The certificate specifically stated that it is understood that the land will be subdivided into lots which will be leased for renewable ninety-nine year terms upon substantially uniform conditions, the form of the lease to be modeled after the leases issued at Lake Chautauqua, New York, and Ocean Grove, New Jersey. The New York lease referred to contained an express covenant the tenant should pay the taxes, while, according to defendant, and not denied by plaintiff, the New Jersey lease contained no such pro-

vision. The Founders certificate also provided that as soon as the land is platted and appraised the corporation will appoint a day upon which the certificate holder may select a lot, this day to be known as Founders Day; that if the certificate holder does not select a lot within one year thereafter such holder may surrender his or her certificate, and upon ninety days' notice shall be repaid the amount advanced at six per cent interest. It is to be noted that under this contract the certificate holder was not obligated to accept a lease on any lot no matter what the provisions of the proposed lease might be, but could treat the certificate as a promissory note and recover the amount advanced with interest. It should also be emphasized that the certificate referred to Founders Day, and informed the holder that she would be notified of its date and that on that date she could select her lot. Late in December, 1921, defendant received through the mails a letter dated December 24, 1921, in a Pacific Palisades Association envelope, the envelope being addressed to her, and the letter being addressed, "To the Founders of the Pacific Palisades Association." This letter stated that January 14, 1922, had been selected as Founders Day, and that on that date all those Founders so desiring could select their lots. The letter continued, "We are preparing the material for the printer to furnish a Founders Hand Book, *which will contain a copy of the plat,* a price list, *the form of the lease,* and a considerable amount of helpful information for the guidance of the Founders in making their lot selections. These will be ready and mailed out from our office on or before January 7, so that you may have them for use during the week preceding Founders Day." This letter was signed by Chas. H. Scott, who was then president of plaintiff corporation. Plaintiff does not deny sending this letter to defendant on or about its date. On or about January 7, 1922, defendant received through the mails on stationery of the Pacific Palisades Association a letter dated January 7, 1922, likewise signed by Dr. Scott, in which it was stated: "We are today reading proof on the Founders Hand Book which we hoped to have in the mail to you tonight. The printer has promised to have them in our hands on Monday [January 9] and envelopes are already addressed so that they should reach you on Tuesday or Wednesday" [January 10th or 11th]. The letter then

pointed out that the company intended to hold open house for the three days immediately preceding Founders Day, January 14th, and recommended that all Founders, if possible, select their lots before January 14th. The letter then continued: "We have said in a previous letter [obviously referring to the letter of December 24, 1921], that we expect to have a copy of the plat and the price list in the Founders Hand Book. It seems now that it may be necessary to send out the Hand Book containing all other information and to provide the Founders with the plat and prices at our tract office any time that they may visit the property after Wednesday, January 11th." Clearly, part of the "all other information" referred to was a copy of the proposed lease referred to in the letter of December 24, 1921. Plaintiff admits that the letter of January 7, 1922, was sent by it. Dr. Scott, as a witness for plaintiff, positively and unequivocally testified that the Founders Hand Book referred to in the letters of December 24th and January 7th, was sent to the Founders prior to Founders Day, January 14, 1922. Defendant produced a hand book which it was testified to was received by her January 11, 1922, which date was stamped thereon by her son when received, and which hand book contained a copy of the proposed lease as promised. The lease contained in this hand book was silent as to who should pay the taxes.  ▆  It is clear, of course, that if a lease is silent as to who shall pay the taxes on the real property, the obligation rests on the landlord. (Note, 73 A. L. R. 824.) Defendant's son and the witness Smith, also Founders, testified that they received hand books from the Pacific Palisades Association on or about January 11, 1922, which hand books were identical with the one received by defendant. Two copies of the hand book which contained the form lease which was silent as to taxes were introduced in evidence, defendant's copy being exhibit F. Defendant and her son had lost or destroyed the envelope in which their respective hand books had been delivered, but the witness Smith had preserved the envelope in which his hand book, identical with that of defendant, had been delivered. This envelope, introduced in evidence, is postmarked January 10, 1922, and has the return address of plaintiff printed thereon. The evidence is without conflict on the point that these hand books were received by defendant, her son, and

Smith prior to Founders Day, January 14, 1922. On the trial plaintiff produced a hand book which Dr. Scott testified was "in use" by plaintiff during 1922 and 1923. This hand book was introduced in evidence and became exhibit 3. Exhibit 3 contained a copy of a proposed lease which expressly provided the tenant must pay all state, city and county taxes and assessments levied on the lot leased. Except that exhibit 3 has no preliminary matter referring to Founders Day and provides for taxes, it is identical with defendant's hand book, exhibit F. It will be remembered that the sales agreements entered into by defendant in March, 1923, all expressly provided that upon defendant completing her payments plaintiff "agrees to deliver to Bertha Deglow Menninger . . . a renewable ninety-nine year lease in substantially the form contained in the Founders Hand Book of said Pacific Palisades Association". There can be no doubt that the burden rested on plaintiff to prove that the leases tendered were "in substantially the form contained in the Founders Hand Book", and that if the leases tendered differed from the form lease in the hand book, plaintiff is not entitled to the relief sought in this action. It is conceded that after defendant completed her payments on the leases (over $7,000) plaintiff tendered to her leases all of which contained the clause imposing liability for taxes on her as tenant, and it is also admitted that defendant refused to execute the leases solely on that ground. Plaintiff was well aware of the basis of defendant's claim before suit was filed, because before that time defendant at plaintiff's request sent to plaintiff a photostatic copy of her hand book, exhibit F, which contained the form lease silent as to taxes. Before trial defendant's deposition was taken and her hand book was introduced in evidence. These last-mentioned facts are recited solely for the purpose of demonstrating that before this action was filed, and certainly long before trial, plaintiff had full knowledge of the basis of defendant's claim for exemption from taxes. Plaintiff was not taken by surprise at the trial. Plaintiff knew defendant had in her possession the hand book in question. The trial court found that the tendered leases were in the form agreed upon by the parties; that plaintiff's hand book, exhibit 3, was "current and in full force" at the date of the several sales agreements; and that the hand book referred to in the

sales agreements contained the tax clause. Based upon these findings the trial court caused to be entered the two judgments already mentioned. The sole point involved on this appeal is the sufficiency of the evidence to sustain these findings. After a careful reading and re-reading of the transcript in this case we are of the opinion that the challenged findings are not supported by the evidence, and that there can be but one interpretation of the evidence, that is, that plaintiff sent to defendant exhibit F, and that defendant was entitled to rely upon that hand book as the one referred to in the sales agreement. ■ We are well aware of the rule that where there is any substantial evidence to support a finding, an appellate court, whatever it may feel as to the weight of the evidence, is without power to disturb the challenged finding, but that salutary rule has no application when the finding in question is totally unsupported by the evidence, and when the evidence, read as a whole, is directly contrary to the finding. That is the situation here presented. Dr. Scott, called by plaintiff, and plaintiff's president, testified that the hand book containing the tax clause, exhibit 3, was the hand book "in use" by plaintiff during 1922, 1923; that it was the only hand book in use by the plaintiff during that period; that Founders Day was January 14, 1922; that the firm of Tower & Lee did the printing for plaintiff during 1922; that he, Dr. Scott, prepared the Founders Hand Book; that his employees sent the hand book to the Founders; that exhibit 3, plaintiff's hand book, was printed "just prior to Founders Day"; that he did not think printers other than Tower & Lee were employed by plaintiff in 1922, although he might be mistaken; that the Sam B. Carlisle Printing Company did some printing for plaintiff, but he believed this was at a later date. This was substantially all of the evidence introduced by plaintiff on this issue, on the opening of its case. The crux of this testimony is that exhibit 3 was printed prior to Founders Day, and was the only hand book used by plaintiff in 1922. Defendant then put on her case. She testified that her son handled all of the negotiations for her in reference to the lots; that exhibit F was the only hand book received by her from plaintiff; that she or her son have had the hand book in their possession since it was received through the mail; that she thinks she received exhibit F prior to Founders

Day; that she is sure she received it prior to March, 1923; that she read it when it was received. Elmore W. Menninger testified that he carried on the business details of the transaction for his mother; that he lived with his mother in 1921 and ever since; that he first saw exhibit F on January 11, 1922, which date he stamped on the book when it was received; that he always called for his mother's mail at the postoffice where she has a box; that he personally secured the envelope containing the hand book from the postoffice; that the envelope was lost; that the envelope had printed thereon the return address of the Pacific Palisades Association; that no other hand book was ever received from plaintiff; that he personally was also a Founder; that he received through the mails a Founders Hand Book identical with exhibit F on January 11, 1922; that it was also in a Pacific Palisades Association envelope. Another witness, Alfred H. Smith, testified that he was a Founder; that he received through the mail a hand book from plaintiff postmarked January 10, 1922; that his hand book, which was introduced in evidence, was identical with exhibit F, and contained no covenant that the tenant should pay the taxes; that this hand book was the only one received from plaintiff. This witness had preserved the envelope in which his hand book was delivered. This envelope is postmarked January 10, 1922, and has printed thereon the return address of plaintiff. The defendant then called Alphonso W. Tower of the printing firm of Tower & Lee, the firm that Dr. Scott · had testified did plaintiff's printing in 1922. He testified that it was the usual custom for his firm to number each job; that his firm had printed exhibit 3, the hand book presented by plaintiff; that the number of that job was 9874, which number was printed on the hand book itself. He then positively testified that from the records of Tower & Lee the order for the printing of exhibit 3 was not delivered to Tower & Lee until January 24, 1922, a date ten days after Founders Day. This testimony is very important because it conclusively fixes the date when the order was given for the printing of exhibit 3 as after Founders Day. That this was the fact is clearly illustrated by an examination of the two hand books. The hand book of defendant, exhibit F, in its preliminary paragraphs, contains references to Founders Day in such a way that it is obvious it was sent

out to assist Founders on that date. Exhibit 3, the hand book upon which plaintiff relies, contains no reference to Founders Day, indicating it was printed at a date subsequent thereto.

After Mr. Tower had fixed January 24, 1922, as the date upon which the order for exhibit 3 was first received by his firm, defendant's son was recalled as a witness. On cross-examination he testified that he had read exhibit F carefully, and particularly noted that in the form lease therein contained no reference was found as to taxes; that not until the time of trial had he seen a hand book containing a clause that the tenant should pay the taxes; that he noticed in the lease form in exhibit F the covenants on the part of the tenant were numbered; that the paragraphs were numbered 1, 3, 4, etc., and that there was no paragraph numbered 2; that this made no particular impression on him. It should be mentioned that in the lease form contained in exhibit 3, clause 2 is the clause imposing the burden of paying the taxes on the tenant. Dr. Scott was then called by plaintiff in rebuttal. He testified that Tower & Lee were to the best of his recollection the only printers hired by plaintiff in 1922; that he had no recollection of ever having seen a hand book with the tax clause omitted until it was introduced in connection with this case. The trial judge then asked Dr. Scott if, after observing the two hand books and noting that exhibit F obviously was prepared prior to Founders Day, while exhibit 3 was apparently prepared after that date, "does that refresh your recollection as to whether that book [exhibit F] might have been printed and published prior to Founders Day and then after the necessity for that language [referring to Founders Day] had been eliminated by the holding of Founders Day, a reprint succeeded, which left that material out"? Dr. Scott answered: "It does not refresh my memory as to the time, but it creates a presumption in my mind that that is the case." He then stated that he had wracked his memory, but had no recollection of exhibit F. He then positively reaffirmed his former testimony that hand books had been sent to Founders prior to Founders Day; that he was totally unable to reconcile that fact with the fact that the order for the printing of exhibit 3 was not given until January 24, 1922, ten days after Founders Day.

We have thus reviewed all of the testimony offered on this point. It seems quite clear to us that the evidence thus summarized does not sustain the finding that exhibit 3 is the hand book referred to in the sales agreement. The positive testimony of Mr. Tower clearly fixes January 24, 1922, as the date when the order for the printing of exhibit 3 was first given to the printer. Plaintiff's president positively and unequivocally testified that hand books were sent to the Founders prior to Founders Day, January 14, 1922. The only hand book presented by plaintiff is therefore a hand book printed after Founders Day. There is a total lack of evidence that this hand book was ever sent to the Founders. Plaintiff has entirely failed to prove that the leases tendered were in conformance with the sales agreement of March 26, 1923. Although it is true that exhibit 3 was *then* in use, the evidence shows that the only hand book sent to the Founders was some hand book sent prior to Founders Day. The only evidence of such a hand book is the evidence of defendant, and her hand book contained no tax clause. If, as appears, defendant received from plaintiff a hand book prior to Founders Day which contained a lease form silent as to taxes, she was obviously entitled to rely on that form in executing the contracts of March 26, 1923. The circumstances upon which plaintiff relies to show that defendant should have known that the tax clause was omitted by mistake, are not sufficient for that purpose. The lease as a whole and the comments in reference thereto contained in exhibit F certainly did not inform her she must pay the taxes on her leasehold. The form lease found in both exhibit 3 and exhibit F contained an express clause that as rental the tenant must pay yearly to plaintiff one per cent of the cost of the lease. This might well have indicated to the prospective tenant that this charge was in lieu of taxes. Although a copy of the lease used at Lake Chautauqua, New York, was also included in both hand books, and although the New York lease contained the tax clause, it did not contain the rental clause. Moreover, the New York lease was materially different in many substantial particulars from the lease proposed by plaintiff. Obviously the New York lease was included for purposes of comparison only. The fact that in the lease contained in exhibit F the covenants on the part of the lessee jumped from 1 to 3 would not of itself

give the reader notice of an omission. There was no break in the continuity of the provisions and the reader might well assume it was a typographical error.

No useful purpose would be served in further reviewing the contentions of the parties. As already stated, the motions to dismiss the appeals are denied. For the reasons stated above the judgments appealed from are reversed.

Rehearing denied.